782 F.2d 1429
 54 USLW 2467
 LAWSON PRODUCTS, INC., a Delaware corporation, Lawson
Products, Inc., a Georgia corporation, Lawson Products,
Inc., a Texas corporation, Lawson Products, Inc., a New
Jersey corporation, Lawson Products, Inc., a California
corporation, Plaintiffs-Appellants,
v.
AVNET, INC., Defendant-Appellee.
 No. 85-1402.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 4, 1985.
Decided Feb. 10, 1986.
 
 Byron L. Gregory, McDermott, Will & Emery, Chicago, Ill., for plaintiffs-appellants.
 Michael B. Roche, Schuyler, Roche & Zwirner, Chicago, Ill., for defendant-appellee.
 Before FLAUM and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 FLAUM, Circuit Judge.
 
 
 1
 Lawson Products, Inc. ("Lawson") appeals from the district court's denial of its motion for a preliminary injunction against its competitor, Avnet, Inc. ("Avnet"). This dispute arose out of an alleged scheme by Avnet to lure customers and sales people away from Lawson in a manner that tortiously interfered with the business and contracts of Lawson. This case, arising in the wake of Roland Machinery Co. v. Dresser Industries, 749 F.2d 380 (7th Cir.1984) and American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589 (7th Cir.1986), requires us to examine the status of the preliminary injunction remedy in this circuit. Finding that, despite possible contrary readings of recent precedent, the granting of injunctive relief remains a discretionary equitable remedy and one to which we will give the district court's decision great deference, we affirm the denial of the preliminary injunction in this case.
 
 I.
 
 2
 Lawson and the Mechanic's Choice division of Avnet are competitors in the business of developing and distributing industrial and automotive supplies. Both companies' primary method of selling their products is through a sizable number of sales representatives who deal directly with customers. These sales representatives appear to be the key to success in the industry since, according to the evidence adduced before the district court, customer loyalty tends to attach to the sales person rather than the products of any individual company. According to Lawson, Avnet commenced a "raid" on Lawson's sales staff in January of 1983. During the course of the alleged raid at least fifty-seven of the eight hundred sales representatives employed by Lawson were contacted and seven of these individuals left Lawson for employment with Avnet.
 
 
 3
 This activity led to the filing of this diversity action in August, 1983, Lawson having voluntarily dismissed a similar action brought in Arkansas a few months earlier. Lawson's complaint alleged tortious interference with business and contractual relations, various acts of unfair competition, and a pendent state action under Illinois law for deceptive trade practices and unfair competition. Both parties inundated Judge Kocoras with affidavits resulting in a mass of often conflicting evidence. By stipulation of the parties the case was submitted to the court solely on the basis of this documentary evidence.
 
 
 4
 Lawson's affidavits portray Avnet's scheme not as a pro-competitive attempt to "out-bid" a rival for valuable talent, but as a many-pronged plot to co-opt the extensive technical training Lawson provides its sales representatives, to acquire confidential information, and to destroy the financial stability of Lawson by encouraging manufacturers, customers, and sales people to breach their contractual, or at least quasi-contractual, obligations to Lawson. This was allegedly accomplished through a series of deceptive practices including misstatements and fabrications about the activities of Lawson's management, as well as at least one instance of commercial bribery and one instance of passing off a Lawson product as that of Avnet. As a result of Avnet's alleged activity seven employees, two of whom eventually returned, left Lawson. No manufacturers abandoned Lawson, however, and Lawson continued to be a highly profitable enterprise. Nevertheless, Lawson claims that it is suffering an ongoing injury as a result of the competitive disadvantage caused by its competitor's access to confidential information, the decreased morale among its employees, and the continuing threat of further corporate "raids."
 
 
 5
 The essential facts according to Lawson are that Avnet's Mechanic's Choice division had suffered from a depleted staff of sales representatives which caused Avnet to embark on the plan to co-opt its competitors' sales staff and, consequently, their customers. Lawson's sales representatives are independent contractors rather than employees and only a fraction of these actually signed contracts with the company. Of the seven people Avnet succeeded in luring away only two had written contracts. Conceding this, Lawson still claims that a contractual employment relationship existed and that the company had a legitimate expectancy in the continuation of the relationship.
 
 
 6
 Before being sent out to the field each representative was given what Lawson claims is the most extensive training in the industry. Upon completion of the training program the sales person was assigned a territory and given a core group of customers as a base for expansion of the individual's business. Also supplied were a price book, a display book, product and operations manuals, and computor printouts that regularly updated customer purchasing patterns. These materials all contained a warning prohibiting unauthorized duplicating, and Lawson produced affidavits indicating that 92 percent of its sales staff viewed these materials as "confidential." The evidence also indicated that none of the documents were marked "confidential" and that the information contained therein was frequently shared with customers. It is the information contained in these materials that Lawson claims was one of the primary aims of the Avnet raid. According to Lawson, Avnet now has access to its price information, customer tendencies, and product specifications, thus allowing the rival to have a competitive advantage in soliciting Lawson customers and the ability to duplicate Lawson products in derogation of Lawson's exclusive manufacturing contracts. Lawson also claims that its technical staff is increasingly unwilling to share information with the sales people in light of Avnet's activities.
 
 
 7
 Lawson's affidavits catalogue a number of alleged unsavory practices utilized by Avnet. First, Lawson claims that Avnet engaged in an active campaign of misrepresentations concerning Lawson's management, product quality, and prices, which was designed to encourage Lawson's customers, suppliers, and sales representatives to switch to Avnet. Second, Avnet is alleged to have "covertly" used the Lawson people it did recruit to encourage further defections while they were still in the employ of Lawson. Third, Lawson claims that one of its employees was offered a twenty-five dollar bribe to agree to speak with an Avnet recruiter. Finally, the affidavits claim that on two separate occasions Avnet employees attempted to "pass off" Lawson products as those of Avnet; one instance involved a demonstration, the other a shipment. In both cases the product itself had Lawson's name printed upon it.
 
 
 8
 These activities, according to Lawson's argument, establish a continuing malicious scheme designed to irreparably injure Lawson by seizing a competitive advantage, by destroying the company's "good will" with its customers, and by injuring employee morale through misrepresentations. In an effort to bolster the argument for a continuing operation, Lawson detailed an earlier consent decree entered into by the parties in New Jersey whereby Avnet would refrain from attempting to recruit Lawson sales people who were under contract. Avnet violated the agreement and successful enforcement proceedings were eventually brought.
 
 
 9
 Avnet countered the evidence and arguments presented by Lawson with its own collection of affidavits that conflict with those of Lawson on practically every matter. The picture Avnet paints is one of normal competition for sales talent where Lawson failed to protect its interests through binding employment contracts. Based on the documentary evidence before him Judge Kocoras concluded that "[p]laintiffs have presented evidence on each required element of the action and defendant has presented equally credible evidence in response." Faced with this morass of evidence, the district judge extensively discussed each element of the requirements for a preliminary injunction under Roland Machinery Co. v. Dresser Industries, 749 F.2d 380 (7th Cir.1984) and concluded that Lawson had failed to meet any single element.
 
 
 10
 The court first analyzed the likelihood of success on the merits and held that the affidavits failed to establish the commercial malice required for the tort of interference with business relations, the actual breach of contract necessary to the tort of interference with contract, and the confidential nature of the Lawson material that was the key element to the claim for unfair competition. Second, the court concluded that there was no irreparable harm to Lawson and that an adequate remedy at law existed. This was based on the ability of Lawson to actively carry on its business activity and sue for any damages caused by the defendant's activities. The judge also evaluated the harm to the defendant and public policy considerations entailed by the scope of the injunctive relief proposed. The requested injunction required more than a restraint on Avnet from illegal activity; it essentially mandated that Avnet maintain a complete "hands-off" policy with respect to Lawson. The court deemed this to be contrary to the legitimate public interest in competition and unnecessarily injurious to Avnet.
 
 
 11
 On appeal Lawson contends that the district court committed reversible error with respect to each of its factual and legal determinations. Lawson argues that since the case was submitted on affidavits without a hearing this court should undertake a de novo review of the record and reverse the district court. We find no merit in Lawson's arguments and thus affirm the district court.
 
 II.
 
 12
 In two recent opinions this circuit has engaged in an exhaustive and scholarly examination of the law of preliminary injunctions. See Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380 (7th Cir.1984) ("Roland ") and American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589 (7th Cir.1986) ("American Hospital "). While both of these opinions specifically disavow any attempt to revise previous law, they have been criticized for engrafting legalistic formalism onto this traditional equitable remedy. See Swygert, Senior Circuit Judge, dissenting in both Roland and American Hospital. This case, arising on the heels of American Hospital, requires that we evaluate the effect of these decisions on the nature of the preliminary injunction. We cannot analyze the merits of a district court's determination without a clear view of the nature of the district judge's role and the implications of that for our appellate review.
 
 
 13
 Roland and American Hospital provide important insights into the theoretical underpinnings of injunctive relief and a valuable source of guidance for district judges. To remove any possible confusion, we conclude that these opinions are in harmony with the traditionally flexible and discretionary responsibilities of the district judge, sitting as chancellor in equity, in preliminary injunction matters. In reaching this conclusion we must discuss three issues arising out of this case: (1) the nature of the district judge's inquiry and evaluation in preliminary injunction cases; (2) the standard of appellate review; and (3) whether the standard of review should be different when the district judge rules solely on the basis of documentary evidence.
 
 1. The Role of the District Judge
 
 14
 The constant theme that permeates both Roland and American Hospital is that while preliminary injunctions are an equitable, interlocutory form of relief, they are an "exercise of very far-reaching power" (Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir.1940) (per curiam)) and one in which the stakes are sufficiently high to make mistakes very costly.
 
 
 15
 The idea underlying these equivalent approaches is that the task for the district judge in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose. The judge must try to avoid the error that is more costly in the circumstances.
 
 
 16
 Roland, 749 F.2d at 388. See also American Hospital, at 593 (The district judge "must choose the course of action that will minimize the costs of being mistaken. Because he is forced to act on an incomplete record, the danger of a mistake is substantial."). The opinions then proceed to seek cost minimization through a clearer enunciation of the role of the district judge and a more meaningful, if not broader, degree of review by the appellate court.
 
 
 17
 After an exhaustive discussion of the inability of courts of appeals to arrive at a consensus about how to review the granting or denial of a motion for a preliminary injunction, the court in Roland detailed the classic hornbook elements of a proper preliminary injunction. As a threshold matter the movant must establish that there is "no adequate remedy at law," a danger of "irreparable harm," and some "likelihood of success on the merits." As is well-documented in Roland, these are all terms that in the context of preliminary injunctions have acquired their own special meaning. See 746 F.2d at 386-88. Having gotten past these threshold inquiries the district court must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the "public interest." See, e.g., Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed.2d 834 (1944). It is at this point of balancing that the approach of Roland and American Hospital first suggests a more explicit formula and discusses the role of the district judge in balancing the equities.
 
 
 18
 a. The Roland and American Hospital Approach
 
 
 19
 Roland and American Hospital adopted a "sliding scale" approach where the possibility of mistake would be minimized by weighing the costs of injunctive relief against the benefits. The benefit of injunctive relief can be determined by combining the probability of success on the merits with the magnitude of the harm to the plaintiff. "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." Roland, 749 F.2d at 387. See also Maxim's Ltd. v. Badonsky, 772 F.2d 388, 391 (7th Cir.1985). This principle was stated in mathematical terms, cf. Judge Learned Hand's opinion in United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947), in American Hospital, at 593. "Grant the preliminary injunction if but only if:
 
 
 20
 P X H p > (1-P) X H d."
 
 
 21
 The left hand of the equation is the magnitude of erroneously denying the injunction, arrived at by multiplying the probability that plaintiff will prevail at trial (P) by the harm to the plaintiff caused by the denial of the injunction (H p). The right hand represents the magnitude of an erroneously granted injunction measured by multiplying the probability that the defendants will prevail at trial (1-P, the inverse of the plaintiff's probability of success) by the harm to the defendant caused by the granting of the motion (H d). Id. at 593-594.
 
 
 22
 Along with the stress on mistake minimization the majority in Roland questioned the "discretionary" role of the district judge in deciding preliminary injunction motions, an issue that has an impact not only on the equitable nature of the remedy but necessarily on the scope of appellate review, see infra Part II, Standard of Review. The granting or denying of these motions has traditionally been left to the sound discretion of the district judge. 7 J. Moore, J. Lucas & K. Sinclair, Jr., Moore's Federal Practice p 65.04 (2d ed. 1985). The court in Roland questioned the use of the shop-worn term "discretion" in this context, see Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 773 (1982), and what that term implies about the limited nature of the role of the court of appeals. 749 F.2d at 388. The function of the district judge with respect to preliminary injunctions was distinguished from such purely "discretionary" actions as sentencing, rulings on evidentiary matters, and rulings on discovery motions, on the grounds that: (1) preliminary injunctions usually entail a fairly extensive hearing; (2) the determination is not discretionary in the classic sense because it is not standardless or intuitive; and (3) the standard applied is in reality "legal" to the extent that the factors considered and the balancing required are mandated. See also Shondel v. McDermott, 775 F.2d 859, 868 (7th Cir.1985).
 
 
 23
 These cases would be troublesome if the verbal and mathematical formulae and the discussion of discretion are misinterpreted to establish a rigid approach to the preliminary injunction question. Roland and American Hospital, in accord with the assurances of the panel in each case that no change in the substantive law was intended, maintain the traditional equitable character of the remedy and provide some important insights into the unique nature of the preliminary injunction that district courts may find useful.
 
 
 24
 First, the concern with the economic cost associated with an erroneously granted injunction is well-placed. The use of the traditional elements coupled with the weighing of interests and harms serves to make the decision-making more principled and thus, hopefully, more accurate. We are convinced that the system, despite its real and semantic shortcomings, see Roland, 749 F.2d at 385-86, has acceptably performed its function over the years and is not in need of a drastic overhaul. Nevertheless, the formula, like Judge Hand's negligence standard, does provide an effective shorthand method of expressing the important relationship between the likelihood of success on the merits and the degree of the harm to the non-prevailing party. Comparing the magnitude of potential errors involved in the grant or denial of the motion is an important element of the equitable balance, as the opinions in Roland and American Hospital correctly emphasize.
 
 
 25
 However, as those opinions also emphasize, a formula is not a substitute for, but an aid to, judgment. A mathematical formula can create a false impression that the elements of the formula, the magnitudes and probabilities, can be accurately quantified and that through a specified type of mental calculus the singularly "correct" result can be arrived at with some exactitude. The obvious problem with this is that the impression is false: a figure representing the probability of success can be arrived at only through a subjective estimate by the court and the magnitudes of harm are rarely susceptable to quantification because of the subjective values, externalities, and effects on the public interest that may be involved in an injunction case. See, e.g., United States Steel Corp. v. Fraternal Association of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir.1970). In fact, it is the inability to measure damage that often is the reason the plaintiff is seeking the injunction. Thus the equation relies on the same type of subjective, impressionistic weighing that has been part of the traditional preliminary injunction determination. At 1431-1432. As Judge Bazelon stated over thirty years ago:
 
 
 26
 When a motion for preliminary injunction is presented to a court in advance of hearing on the merits, it is called upon to exercise its discretion "upon the basis of a series of estimates: the relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury allegedly flowing from denial of preliminary relief, the probability of the ultimate success or failure of the suit, the balancing of damage and convenience generally. A mere listing of the guiding considerations demonstrates their intangible nature especially when no attempt is made at this stage to decide finally the questions raised."
 
 
 27
 Perry v. Perry, 190 F.2d 601, 602 (D.C.Cir.1951). See also National Organization for Women v. Social Security Administration, 736 F.2d 727, 742 (D.C.Cir.1984) (quoting Perry ).
 
 
 28
 While the use of an equation has no impact upon the nature of the district court's inquiry, the implication that a "correct" answer can be achieved would represent a change in the law and is thus of greater concern. It must be remembered that preliminary injunctions have the dual characteristic of being equitable, such that there is no "right" to obtain one, Weinberger v. Romeo-Barcelo, 456 U.S. 305, 311-13, 102 S.Ct. 1798, 1802-03, 72 L.Ed.2d 91 (1982), and being "by [their] very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 739, 742 (2d Cir.1953). See also United States v. White County Bridge Commission, 275 F.2d 529, 534 (7th Cir.1960). The temporary nature of the remedy mitigates, without eliminating, the concern with the possibility of mistake and need for the "correct" answer. See United States Steel Corp. v. Fraternal Association of Steelhaulers, 431 F.2d at 1048; Miss Universe, Inc. v. Flesher, 605 F.2d 1130, 1133 (9th Cir.1979). More significantly, the equitable personality of injunctive relief requires the result to be a "just" or "fair" result rather than a "correct" result. See 1 S. Symons, Pomeroy's Equity Jurisprudence Sec. 59 (5th ed. 1941) ("Its [equity's] very central principles, its foundation upon the eternal verities of right and justice, its resting upon the truths of morality rather than upon arbitrary customs and rigid dogmas, necessarily gave it this character of flexibility, and permitted its doctrines to be enlarged so as to embrace new cases as they constantly arose."); 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2947 (1973). The district judge, sitting as a chancellor in equity considering a preliminary injunction, endeavors to achieve a rough justice between the parties that will maintain the status quo pending trial. Moore's Federal Practice at p 65.04. The remedy itself can be flexibly crafted to achieve this "rough justice" in the particular case before the court, see Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944); Duran v. Elrod, 713 F.2d 292, 297 (7th Cir.1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984); Tanner Motor Livery Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir.1963), cert. denied, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1969). Thus it is impossible to think in terms of a single correct result. In each case there exist a number of fair accommodations. If a rigid formulaic approach is used, where the motion is granted only if X > Y or so many stated criteria are met, one of the central questions, what kind or degree of relief is appropriate, is not answered. As the type of relief varies the parameters of the injunction equation will also change, making it very difficult to achieve the accurate, cost-minimizing result. Implicit in equity's connection to the vague concept of fairness is a need for flexibility. A.L.K. Corp. v. Columbia Pictures Industries, 440 F.2d 761, 763 (3d Cir.1971) ("In applying these criteria, a district court must have considerable discretion because of the infinite variety of situations which may confront it. Nevertheless, its discretion is not unlimited and must be guided by the traditional principles of equity.") (emphasis added). See also 1 Pomroy's Equity Jurisprudence at Secs. 59-60. Roland and American Hospital do not limit in any way the ability of the district courts to flexibly weigh the competing considerations and mold appropriate relief in preliminary injunction cases.
 
 
 29
 b. The Discretion of District Judges
 
 
 30
 Besides our concern with the possible misinterpretation of the American Hospital equation, the second major area where there is a potential for distortion of our precedent is in the discretion of the district court, a concept intractably interwoven with the scope of appellate review. It is beyond argument that the term "discretion" has been sapped of its vitality through over-use and misuse. Nor is it subject to doubt that the existence of an evidentiary hearing, broad guidelines concerning what the relevant factors are, and a need to apply the substantive law applicable to the case in order to determine likelihood of success all make the discretion, for lack of a better word, in an injunction setting appear to be different than the type of discretion exercised over evidentiary matters. This apparent difference is vital because it emphasizes the importance of the preliminary injunction to any litigation by stressing the need for the principled exercise of equity power where there are great ramifications to the parties' substantive rights. The difference, however, is actually illusory since the distinction rests on an over-generalization concerning the number of decisions involved in a preliminary injunction determination.
 
 
 31
 During the course of deciding whether to grant the motion the district court must take a number of non-discretionary actions: (1) it must evaluate the traditional factors enunciated in the case law; (2) it must make factual determinations on the basis of a fair interpretation of the evidence before the court; and (3) it must draw legal conclusions in accord with a principled application of the law. See, e.g., Zepeda v. INS, 753 F.2d 719, 724-25 (9th Cir.1983). Once all the equitable factors are before the judge, however, a classic discretionary decision must be made involving how much weight to give individual components of the calculus and to what direction the balance of equity tips. See United States Steel v. Fraternal Association of Steelhaulers, 431 F.2d at 1048. The ultimate decision of whether or not to grant the motion is in a real sense intuitive. The law of injunctions tells the judge what factors are relevant but, as discussed above, the balancing and weighing process is not susceptible to quantification or formalization. Ultimately, the district judge has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case. Thus, while the distinction drawn in Roland between the entire decisionmaking process involved in a preliminary injunction motion and a classic example of "discretion" is valid, the final, and most important, decision as to whether to grant or deny the motion is discretionary, as that term is defined in Roland. See 749 F.2d at 387-88.
 
 2. Standard of Review
 
 32
 As a necessary corollary to the discussion of the discretion of the district court, the Roland and American Hospital opinions questioned the further use of an "abuse of discretion" standard of review. See Roland, 749 F.2d at 389-90, American Hospital, at 595-596. The doubts expressed in these opinions with the usual formulation of the standard of review can be traced back to the same concerns that motivated the questioning of the role of the district judge. First, since there are legal principles and standards to be applied by the district court an appellate court has more to review than the judge's discretion. Cf. Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir.1985) ("In the language of administrative law, the grant of discretionary relief under the immigration laws is a question on which there is 'no law to apply,' and when there is no law to apply judicial review is exceedingly constricted."). Second, the majority in Roland and American Hospital felt that the term "abuse of discretion" had become an uninformative term-of-art: "this phrase covers a family of review standards rather than a single standard, and a family whose members differ greatly in the actual stringency of review." American Hospital, at 595. See also Roland, 749 F.2d at 388-91. Thus, the court in Roland concluded that "[t]he question for us is whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes." Id. at 390.
 
 
 33
 There can be no quarrel with the conclusions that the appellate role is in some sense broader than in the review of evidentiary rulings and that a cohesive definition of abuse of discretion has escaped the judicial imagination. Nevertheless, in an attempt to avoid any possible confusion, it is important to reiterate this court's assurances that Roland and American Hospital did not change any of the law governing preliminary injunctions. An analysis of the incongruities pointed out in those opinions reveals that the problems are more semantic than real.
 
 
 34
 As was stated in the discussion of the discretion of the trial court, the preliminary injunction decision involves the resolution of a number of different issues, some of which are non-discretionary; others, like the final weighing and balancing of the equities, are classically left to the discretion of the district judge. Appellate review therefore must vary with the nature of the lower court decision. When a court of appeals considers a preliminary injunction order, which should set forth the judge's reasoning under Fed.R.Civ.P. 65(d), the factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given de novo review. SEC v. Suter, 732 F.2d 1294, 1300 (7th Cir.1984); E. Remy Martin & Co. v. Shaw-Ross International Imports, 756 F.2d 1525, 1529 (11th Cir.1985). However, the ultimate evaluation and balancing of the equitable factors is a highly discretionary decision and one to which this court must give substantial deference. The variance in the standard of review expressed in Roland may, in part, be attributed to the existence of errors of law or fact. Clearly, a factual or legal error may alone be sufficient to establish that the court "abused its discretion" in making its final determination. See Zepeda v. INS, 753 F.2d 719, 724 (9th Cir.1983) ("A district judge may abuse his discretion in any of three ways: (1) he may apply incorrect substantive law or an incorrect preliminary injunction standard; (2) he may rest his decision to grant or deny a preliminary injunction on a clearly erroneous finding of fact that is material to the decision to grant or deny the injunction; or (3) he may apply an acceptable preliminary injunction standard in a manner that results in an abuse of discretion."). See also Buchanan v. United States Postal Service, 508 F.2d 259, 267 n. 24 (5th Cir.1975); Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 203 (2d Cir.1966). However, in the absence of such an error the district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases. Thus, the nature of what exactly is being reviewed should not be used to obfuscate the fact that the standard of review of the grant or denial of a preliminary injunction is the deferential "abuse of discretion" standard.
 
 
 35
 The traditional deferential review is in harmony with the stress in Roland and American Hospital on mistake minimization. The depth of appellate scrutiny varies with the degree to which the appellate court's perspective approximates the district court's first-hand experience. For example, a court of appeals is in a better position to review legal conclusions than findings of fact, which may have been based on intangibles, like the demeanor of a witness. When it comes to reviewing the weighing and balancing of equities in a preliminary injunction case an appellate court lacks a complete perspective since a cold record cannot totally reflect the district judge's sense of the equities or the merits of a case. Cf. Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216, 67 S.Ct. 752, 755, 91 L.Ed. 849 (1947) (In the context of Rule 50(b) motions, the Court stated the motion "calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart.") (emphasis added). And while it is true that the district judge may have to act with some dispatch based on a record that is not fully developed, it is hard to imagine why an appellate judge, relying on a distillation of what was before the lower court, is less likely to "inappropriately" balance the equities involved.
 
 
 36
 Under any feasible or conceivable system, our trial courts must always have the last word in the great bulk of cases. I doubt whether there will be much satisfaction with the judgments of trial courts among a public which is educated to believe that only appellate judges are trustworthy ministers of justice.
 
 
 37
 * * *
 
 
 38
 If trial judges are carefully selected, as in the federal system, it is hard to think of any reason why they are more likely to make errors of judgment than are appellate judges.... [T]he trial judge has the advantage of having lived with the case, and thus should be better able than the appellate judges to gauge its complexity and procedural needs.
 
 
 39
 Wright, The Doubtful Omniscience of Appellate Courts, 41 Minn.L.Rev. 751, 781 (1957). Deference is necessary to avoid exacerbating the danger of mistake: while an appellate court can distinguish a good injunction decision from a bad one, the appellate process is not well suited to an appreciation of the subtle shadings of a case that may lead to a judgment which lies between the extremes.
 
 
 40
 Finally, there is question of how to describe the traditional deferential standard. At one level the issue is somewhat unimportant because regardless of whether the standard is framed in terms of "abuse of discretion" or "bounds of permissible choice," reviewing courts have never appeared to be stymied in reaching results in preliminary injunction cases. See Roland, 749 F.2d at 396-97 (Swygert, Senior Circuit Judge dissenting). Under these circumstances the enunciation of a new standard, even an arguably more accurate one, may serve to confuse the bench and the bar by leaving the false impression that a transformation in the law is taking place.
 
 
 41
 This is not the first time this court has had to deal with a term that seems to escape easy definition. An analogous situation was faced with regard to the attempt to define "reasonable doubt" in jury instructions. In United States v. Lawson, 507 F.2d 433, 441-42 (7th Cir.1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975), the court held that because the difficulties associated with defining the term are insurmountable the failure to give an instruction on reasonable doubt is not error.
 
 
 42
 Because of the very commonness of the words, the straining for making the clear more clear has the trap of producing complexity and consequent confusion. That this difficulty may be surmounted is evidenced by the attempts which have been approved, although the language of approval has frequently implicitly suggested the difficulties of articulation. That the difficulties may be surmounted, however, does not mean in our opinion that the effort has to be made.
 
 
 43
 507 F.2d at 442. See also United States v. Regilio, 669 F.2d 1169, 1178 (7th Cir.1981).
 
 
 44
 The term "abuse of discretion," despite its many shortcomings, still accurately reflects the need for deference to the judgment of the district judge. Attempts at further definition have tended to "produce complication and corresponding confusion." In the absence of a compelling and precise articulation of a standard of review we find no reason in the context of preliminary injunctions to reject the abuse of discretion standard or require an all-encompassing definition of that standard. This approach may be intellectually and theoretically unsatisfying, but it does have the virtue of avoiding unnecessary tinkering with at least one aspect of the judicial system that seems to be functioning smoothly.
 
 3. The Documentary Evidence
 
 45
 Lawson contends that because the motion was submitted solely on affidavits this court should engage in a de novo review. This argument is based exclusively on the Second Circuit's decision in Norlin Corp. v. Rooney, Pace, Inc., 744 F.2d 255 (2d Cir.1984) which held that:
 
 
 46
 As a general rule, a preliminary injunction will be sustained on appeal absent an abuse of discretion by the lower court. Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co., 604 F.2d 755, 758 (2d Cir.1979). The propriety of this principle stems from our recognition that a trial court is in a better position to assess the credibility of testimony and make factual findings than an appellate court. The rule is, however, bounded by its own rationale. Where there has been no evidentiary hearing, and the decision below is based entirely upon legal arguments and papers submitted to the court, we may undertake our own review of the pleadings, affidavits and depositions to ascertain the correctness of the district judge's ruling. See Dopp v. Franklin National Bank, 461 F.2d 873, 879 (2d Cir.1972).
 
 
 47
 744 F.2d at 260-61.
 
 
 48
 Forty years ago this circuit faced the same issue and while it was acknowledged that the court of appeals was in a different position with respect to a preliminary injunction motion based on documentary evidence, the abuse of discretion standard was retained.
 
 
 49
 Ordinarily, the district court's action on an application for a temporary injunction is well-nigh final. It will be modified or vacated only when it appears there was an abuse of discretion. United States v. Corrick, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 [ (1936) ]. However, in this appeal, since the trial court's action was based solely upon the verified complaint and an opposing affidavit, and no oral evidence was offered, we are in the same position as was the district court. Even so, we are, in a sense reviewing the exercise of the trial court's discretion.
 
 
 50
 National Grain Yeast Corp. v. City of Crystal Lake, 147 F.2d 711, 713 (7th Cir.1945). Thus the questions that must be answered are whether an appellate court should engage in de novo review of the district court's factual findings based on the documentary evidence and, if so, whether this has an impact on the degree or nature of the review of the ultimate injunction decision. We hold that the answer to both questions is no.
 
 
 51
 Rule 52(a) of the Federal Rules of Civil Procedure provides, in part, that "[f]indings of fact shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses." In Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985), the Supreme Court held that the rule should be read literally. It contains no distinctions between types of factual findings and none will be implied. The "clear error" standard applies "even when the district court's findings do not rest on credibility determinations, but are based on physical or documentary evidence...." 105 S.Ct. at 1512 (emphasis added). The notion in Norlin and National Grain Yeast that the lack of a hearing involving credibility determinations transforms appellate review into a second full hearing has been explicitly rejected. Id. at 1512. See also Planned Parenthood Assoc. v. Chicago Transit Authority, 767 F.2d 1225, 1229 (7th Cir.1985). Axiomatically, if there is no effect on our review of the underlying factual determinations there is no impact on the deferential standard of review this court has traditionally required in preliminary injunction appeals.
 
 
 52
 It must be stressed that while an appellate court need not sit as a court of first impression with respect to the record there is an obligation under Rule 52(a) to engage in a comprehensive review of the documentary evidence to determine if clear error has been committed. Anderson, 105 S.Ct. at 1515 (Powell, J. concurring). Thus the appellate role is not to rubber stamp the lower court's determination. But the parties should keep in mind that their opportunity before the district court is "the 'main event' ... rather than a 'tryout for the road.' " Anderson, 105 S.Ct. at 1512 (quoting Wainwright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977)). The situation is no different if there is a live performance or just a mountain of paper.
 
 III.
 
 53
 Turning to the merits of Lawson's appeal we find no reason to overturn the district court's denial of the preliminary injunction motion. For purposes of reviewing the denial of the preliminary injunction Lawson's claims can be separated into: (1) the past injury and future threat resulting from Avnet's solicitation of Lawson's sales force and acts of commercial disparagement; (2) the competitive advantage given Avnet when it appropriated for its own use Lawson's "confidential" information; and (3) the loss of goodwill resulting from the raid.
 
 
 54
 The first point that must be stressed is that this is a preliminary injunction so that we are concerned with the equities of maintaining the status quo pending the ultimate determination on the merits. See Part II, supra. While we realize that the reality of the preliminary injunction determination is that it affects the ultimate outcome, when, as the trial court correctly held here, there are two equally credible versions of the facts the court should be highly cautious in granting an injunction without the benefit of a full trial. See Roland, 749 F.2d at 388. In such a situation the district judge must pay particular attention, as did Judge Kocoras in this case, to whether the movant has satisfied the threshold requirements of irreparable harm and an inadequate remedy at law.
 
 
 55
 With respect to the injury resulting from the loss of its seven employees the affidavit of Lawson's president established the possibility of money damages reflecting the profits actually lost as a result of the raid. While the difficulty in calculating future profits can often justify the finding of an irreparable injury with no adequate remedy at law, Roland, 749 F.2d at 386, there is no per se rule that claims of lost profits are invariably uncalculable. See Buckingham Corp. v. Karp, 762 F.2d 257, 262 (2d Cir.1985). Where the president of the plaintiff corporation can propose a figure entitled "Business lost projected for 12 months based on business done since representative's departure" the district court is within its discretion in finding an adequate remedy at law.
 
 
 56
 Likewise the threat that future raids will irreparably injure the plaintiff before a full trial is held is insufficient to justify a preliminary injunction. Two rationales expressed by the district judge establish the lack of necessity for interlocutory injunctive relief. First, Lawson had at its disposal the ability to take self-protective measures without judicial intervention. In his opinion Judge Kocoras stated:
 
 
 57
 In the absence of the proposed order, plaintiffs will likely continue to operate their business. They may continue their efforts to sign their own sales force to written contracts which include restrictive covenants and specifically provide for the confidentiality of company materials such as price lists, customer lists, and display or promotional materials. Plaintiffs are free to sign outside, new personal to similar contracts. Plaintiffs are free to regain any old customers by competing lawfully against Avnet and others. The plaintiffs may sue and recover from these seven salesmen and any others for breach of their fiduciary duties to a former employer and enjoin them as individuals from revealing information which plaintiffs allege is confidential.
 
 
 58
 Second, the relative degree of past injury does not indicate that Avnet's activities can result in a serious undermining of Lawson's sales force, at least not during the period between the denial of the motion and trial. Avnet contacted fifty-seven of the eight hundred Lawson salespeople, seven of whom actually left. Under the theories of liability presented by Lawson, tortious interference with contractual and business relationships, there is no actionable wrong in the absence of an actual breach, see Ancraft Products Co. v. Universal Oil Products Co., 84 Ill.App.3d 836, 40 Ill.Dec. 70, 405 N.E.2d 1162 (1980). Thus the extent of Lawson's injury from the raid, apart from such intangibles as trade secrets or goodwill, is the loss of seven salespeople. While it may be that Lawson can ultimately establish the wrongfulness of Avnet's actions and Lawson's entitlement to an injunction, where the past injury indicates a very limited threat of future harm during the pre-trial period and the record is ambivalent as to the merits of the dispute the district court is within its discretion to deny the preliminary injunction.
 
 
 59
 Thus Lawson's primary claims lie in the areas of loss of goodwill and confidential information because of the potential for future harm and the difficulty of measuring damages. Our review of the record, however, finds ample support for the district court's conclusion that Lawson did not suffer a loss of goodwill or confidential information. First, the affidavits support the court's ruling that "goodwill" attached to the relationship between salesperson and customer rather than the relationship between corporation and customer. Under these circumstances any interest Lawson had in the salesperson's "goodwill" would be adequately compensated in lost profit damages since any injury would presumably not extend beyond the insular salesperson-customer relationship to the corporation in general.
 
 
 60
 Second, Judge Kocoras correctly found that the customer lists and information, the display books, and price lists were not trade secrets, and thus not confidential information, under Illinois law. Given the evidence that (1) all Lawson's sales force and customers had access to the information; (2) much of the information served to supplement data compiled by the salesperson for his or her own use; (3) the information could be acquired by other means such as phone calls or visits to customers or suppliers whose names could be found in the yellow pages; (4) the information became outdated rapidly; and (5) no formal confidential arrangements were made, this case is indistinguishable from a well-established line of cases in Illinois denying protection where the information is not kept under "lock and key." See Hayden's Sport Center v. Johnson, 109 Ill.App.3d 1140, 65 Ill.Dec. 612, 441 N.E.2d 927 (1982); Lincoln Towers Insurance Agency v. Farrell, 99 Ill.App.3d 353, 54 Ill.Dec. 817, 425 N.E.2d 1034 (1981); Midwest Micro Media, Inc. v. Machotka, 76 Ill.App.3d 698, 32 Ill.Dec. 241, 395 N.E.2d 188 (1979); and cases cited therein.
 
 
 61
 Lawson also advances a number of other claims relating to injuries to morale, commercial disparagement, passing-off of products, and commercial bribery. Having examined the record we conclude that none of these claims would justify injunctive relief, particularly given the equally credible evidence for viewing Avnet's actions as normal competition.
 
 IV.
 
 62
 In conclusion, it is important to reemphasize the scope and nature of the preliminary injunction remedy in this circuit. Roland and American Hospital provide important insights which may be helpful in the exercise of a district judge's discretion. Nevertheless, these decisions, as well as this opinion, represent a continued affirmation of the traditional equitable factors governing injunctions and the classic roles of both district and appellate courts. Preliminary injunctions should be granted when the plaintiff has suffered an irreparable injury for which there is no adequate remedy at law and where the balance of the equities, reflecting the relative harm to each party entailed in granting or denying the injunction, the probable outcome of a trial on the merits, and the public interest, is determined by the district judge to favor the movant. See Mantek Division of NCH Corp. v. Share Corp., 780 F.2d 702, 706 (7th Cir.1986); ON/TV of Chicago v. Julien, 63 F.2d 839, 842 (7th Cir.1985). Under the traditional framework the district court, for the aforementioned reasons, did not abuse its discretion in denying Lawson's motion and that decision is accordingly affirmed.