**Richard GROTEMEYER, Richard Ekstrom, and Myerstrom Industries, Inc., an Illinois Corporation, Plaintiffs,**

v.

**LAKE SHORE PETRO CORP., an Illinois Corporation, Defendant.**

**No. 90 C 4942.**

United States District Court, N.D. Illinois, E.D.

Oct. 12, 1990.

---

Roger J. Guerin, Kevin J. Moore, Rothschile, Barry & Myers, Chicago, Ill., for plaintiffs.

Norman N. Berkson, Arthur M. Gorov, Berkson Gorov & Levin, Ltd., Chicago, Ill., for defendant.

## ORDER

NORGLE, District Judge.

Before the court is the amended preliminary injunction motion of plaintiffs Richard Grotemeyer, Richard Eckstrom, and Myerstrom Industries, Inc. For the reasons discussed below, the motion is denied.

## FACTS

On February 1, 1983, Lake Shore Oil Company, the corporate predecessor to defendant Lake Shore Petrocorp. ("Lake Shore"), entered into a Dealer's Lease Agreement (the "Agreement") for a three-year term with options to renew with George Rusik. On August 26, 1985, plaintiffs purchased the rights under the Agreement from Rusik.

The Agreement authorizes plaintiffs to lease from Lake Shore the premises at 3501 West 95th Street, Evergreen Park, Illinois and to use the premises for the purpose of operating a gasoline service station and automatic car wash. The Agreement has been renewed through September, 1990. For months, in the negotiating a renewal of the Agreement beyond September, 1990, Lake Shore proposed certain changes in the franchise Agreement. Under the proposed new agreement, Lake Shore would build and operate, at its expense, a convenience store on the premises. Although plaintiffs would not share in the profits or losses of the convenience store, Lake Shore points out that the store would benefit plaintiffs indirectly by generating additional business for their service station and car wash. Also under the proposed renewal agreement, plaintiffs would be responsible for all of the real estate taxes for the premises

(under the original Agreement, plaintiffs were only responsible for amounts in excess of the 1982 real estate taxes).

After months of negotiation, plaintiffs did not accept the terms of Lake Shores' renewal proposal. On January 11, 1990, Lake Shore sent plaintiffs a certified letter advising them of its nonrenewal of the Agreement. In this letter, Lake Shore stated that the nonrenewal would take effect on September 31, 1990 (sic), the expiration date of the extended Agreement. The letter also stated the reason for nonrenewal:

> In compliance with the Petroleum Marketing Practices Act, you are hereby notified that Lake Shore Petrocorp has determined that in the normal course of business the continuation of said lease is likely to be uneconomical to Lake Shore Petrocorp.

Finally, the letter stated that it conformed to the notice provisions of the Petroleum Marketing Practices Act as stated in the summary of the Act, published by the U.S. Secretary of Energy; however, the letter did not enclose a copy of the summary itself.

According to oral representations by plaintiffs' counsel, negotiations between the parties continued after the January 11, 1990 notice of nonrenewal. Ultimately, the parties were unable to resolve their differences and Lake Shore negotiated a new franchise agreement with a third party. This agreement provides for a lease of the premises with the convenience store and increased rental. Plaintiffs filed this action on August 23, 1990. On September 12, 1990, plaintiffs filed their motion for preliminary injunction. They filed this amended motion for preliminary injunction later that day.

1. These enforcement provisions provide that the court "shall grant a preliminary injunction" if:
 (A) the franchisee shows—
 (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
 (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

## DISCUSSION

Plaintiffs' Complaint is brought under the provisions of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.* The PMPA is intended to protect franchised retailers of motor fuel from "arbitrary or discriminatory termination or nonrenewal of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Admin. News 873, 874; *see Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1216 (7th Cir.1982). The PMPA prohibits franchisors from terminating or failing to renew franchises except on the basis of specifically enumerated grounds and upon compliance with certain notification requirements.

■ The Complaint alleges that Lake Shore violated the PMPA by failing to renew the Agreement for reasons outside those specifically sanctioned by the Act. Plaintiffs argue that the court must apply the liberal preliminary injunction standard set out in the enforcement provisions of the PMPA.[1] However, § 2805 of the Act provides that:

> ... the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced—
>
> (A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee.

15 U.S.C. § 2805(b)(4). Plaintiffs have delayed over seven months after receiving notice of nonrenewal to file this action, and are precluded from benefiting from this statutory injunction standard, provided that Lake Shore's notice of nonrenewal complied with the statutory notice requirements of the PMPA.

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.
15 U.S.C. § 2805(b)(2).

In that regard, the court finds that Lake Shore's January 11, 1990 notice of nonrenewal substantially meets all of the requirements of § 2804(a). That provision states that a franchisor must provide notice to the franchisee at least 90 days prior to nonrenewal of the franchise relationship, and that the notice must conform to the provisions of § 2804(c), which requires that such notification:

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain—

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefore;

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section.[2]

15 U.S.C. § 2804(c).

■ Lake Shore's certified letter of January 11, 1990 was provided more than 90 days prior to nonrenewal and obviously met the first two numbered requirements of 2804(c). Further, this letter contained a statement of intention not to renew, together with the reasons therefore,[3] pursuant to requirement (3)(A), and the effective date of the nonrenewal, pursuant to (3)(B). Plaintiffs, however, contend that Lake Shore's notice letter is invalid, as it did not contain the Secretary of Energy's statutory summary as required by 2804(c)(3)(C). Because Lake Shore makes no effort to rebut this contention, the court assumes that it is true. The court therefore must address the effect of this technical defect.

Plaintiffs argue that this technical defect renders the January 11, 1990 notice invalid and alone provides sufficient grounds for granting the preliminary injunction. In support of this argument, plaintiffs cite to *Blankenship v. Atlantic Richfield Co.*, 478 F.Supp. 1016 (D.Or.1979), for the proposition that the notice requirements of the PMPA must be strictly construed and that the court does not have the power to cure a notice defect. Lake Shore has not responded to this argument which is supplied for the first time in Plaintiff's Reply Memorandum. The issue of whether the "summary statement requirement" of the PMPA notice provisions must be construed strictly has not been addressed in this circuit.

In the *Blankenship* case a defendant had provided otherwise proper notice approximately eighty days before the expiration of the franchise agreement, in violation of the 90 day notice period provided in § 2804(a). The court held that even though a strict application of the notice provision would create a hardship on the franchisor, the court had no power to cure or waive a

---

**2.** Subsection (d)(1) of section 2804 states that: Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this subchapter.

**3.** Although plaintiffs dispute the validity of Lake Shore's "grounds" for nonrenewal—an issue which will be discussed in further detail later in this opinion—they cannot claim that a sufficient "reason" was not provided in the January 11, 1990 letter. Significantly, the test for evaluating the sufficiency of a "reason" for nonrenewal (for the purposes of the section 2804 notice requirements) is distinct from the test for evaluating the permissibility of the "grounds" for nonrenewal under section 2802. *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1226 (7th Cir.1990). *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1211 (7th Cir.1984). For the purpose of the notice requirement articulated in § 2804(c)(3)(A), "[t]he PMPA requires only that the franchisor articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act." *Brach*, 677 F.2d at 1226. In *Brach*, the Seventh Circuit held that notice was proper under section 2804 where the reason for nonrenewal, as stated in the notice, was that the franchisee was "unable to purchase the premises as previously stipulated." 677 F.2d at 1216, 1225. Here, notice was served after the parties failed to agree on terms for renewal, and plaintiffs were notified that Lake Shore determined that continuation of the franchise on the existing terms would be uneconomical. Although plaintiffs dispute that continuation of the franchise would indeed be "uneconomical" to Lake Shore, they cannot dispute that the notice was sufficiently articulated to enable them to determine their rights under the PMPA.

notice defect. 478 F.Supp. at 1018. Other cases have followed the example of *Blankenship* and have strictly construed the PMPA notice requirements. *See, e.g., Greco v. Mobil Oil Corp.*, 597 F.Supp. 468, 471 (N.D.Ill.1984) ("Failure to comply with the notice provision, even if the defect is only a minor or technical one, is grounds to enjoin the termination or nonrenewal of the franchise relationship"). Neither *Blankenship* nor *Greco*, however, specifically addressed notice defects arising from a franchisor's failure to supply a summary statement pursuant to § 2804(c)(3)(C).[4]

A number of more recent cases have criticized the strict construction rule of *Blankenship* and its progeny, particularly in regards to the "summary statement requirement" of § 2804(c)(3)(C). *See Amadeo v. Mobile Oil Caribe, Inc.*, 642 F.Supp. 962 (D.P.R.1986) ("An otherwise proper notice will not be rendered invalid for failure to include a summary statement" where there is no indication that the plaintiff was prejudiced thereby); *Brown v. Magness Co.*, 617 F.Supp. 571, 574 (S.D.Tex.1985) (franchisor's "failure to furnish a 'summary statement' as required by the Act does not render the ... notice invalid absent a showing of prejudice"); *Martin v. Texaco, Inc.*, 602 F.Supp. 60, 61 (N.D.Fla.1985) (crit-

icizing *Blankenship* and holding that failure to supply summary statement is not dispositive on issue of improper notice where franchisee was not prejudiced); *see also Herman v. Charter Marketing Co.*, 692 F.Supp. 1458, 1461 (D.Conn.1988) (discussing the disparity between the two approaches to construing the PMPA notice provisions and declining to follow the strict construction rule of the "early cases" which "exalt form over substance").[5]

The court finds these recent cases to be both better reasoned than *Blankenship* and its progeny, and more relevant to the summary statement requirement issue. The facts in this case provide a particularly good example of how strict construction of the summary statement requirement would elevate form over substance. The purpose of the summary statement requirement is not stated in the legislative history;[6] presumably the purpose is to inform franchees of their rights and enable them to protect their interests. Here, during some if not all of the prolonged period between the notice of nonrenewal and the expiration of the Agreement, plaintiffs were apparently represented by counsel who were fully capable of advising plaintiffs of their rights under the PMPA.[7] Because their rights

---

**4.** The only Seventh Circuit case remotely on point is *Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir.1984). In *Moody*, the Seventh Circuit noted that "[a] franchisor must comply strictly with the notice requirements of the PMPA." 734 F.2d at 1211. However, in that case, the only notice issue was whether the notice was proper under the statute when it was sent to an incorrect address. The court held that where the incorrect address caused no actual delay, the error would not render the notice improper under the PMPA. This case did not discuss the summary statement requirement of the PMPA notice provisions.

**5.** The court notes that only one case has attempted to apply the strict construction doctrine to the summary statement requirement. *Thompson v. Kerr–McGee Refining Corp.*, 660 F.2d 1380 (10th Cir.1981). In *Thompson*, the Tenth Circuit held that compliance with the summary statement requirement is mandatory and that: "If Congress had intended the courts to have the power to cure or waive a notice defect, it would have so provided in Section 2804 which sets out the notice provisions." *Id.* at 1390. Although the Tenth Circuit in effect

stated that the summary statement requirement should be applied as a *per se* rule, it implicitly sanctioned a set of jury instructions in which the trial court applied that requirement under a "rule of reason." *See Martin v. Texaco, Inc.*, 602 F.Supp. 60, 63 (N.D.Fla.1985) (discussing the *Thompson* opinion and noting the Tenth Circuit's implicit approval of the jury instruction regarding the summary statement). This apparent contradiction undermines the weight of *Thompson*.

**6.** *See* S.Rep. No. 731, 95th Cong., 2d Sess. 15, 40, 41, *reprinted in* 1978 U.S.Code Cong. & Admin. News 873, 898–899.

**7.** According to oral representations by plaintiff's counsel, the reason why plaintiffs did not file their suit earlier was that they had continued negotiating the terms of renewal with Lake Shore and had hoped to resolve their differences without going to court. Counsel did not argue that plaintiffs had only recently retained legal counsel and had previously been unaware that they had any legal rights in the matter. The court infers from these representations that plaintiffs were represented by counsel during

were protected by counsel, plaintiffs were not prejudiced by Lake Shore's failure to supply them with a summary statement and the purpose of the statutory requirement was not frustrated.[8] For the above reasons, the court finds that Lake Shore's letter of January 11, 1990 substantially complied with the notice provisions of § 2804, and that plaintiffs' failure to file suit within ninety days thereafter precludes them, under § 2805(b)(4)(A), from benefitting from the liberal preliminary injunction standards of the PMPA. Thus, the court will apply the relevant common law preliminary injunction standard.

In order to grant a preliminary injunction, a court must find: 1) the plaintiff has at least a reasonable likelihood of success on the merits; 2) the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; 3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and 4) the granting of a preliminary injunction will not disserve the public interest. *Adams v. Attorney Registration and Disciplinary Comm'n,* 801 F.2d 968, 971 (7th Cir.1986), *citing Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976); *see also Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 386–89 (7th Cir. 1984). The plaintiff has the burden of proving each of these factors. *Roland v. Air Line Employees Ass'n,* 753 F.2d 1385, 1392 (7th Cir.1985).

■ The ultimate decision in weighing and balancing these factors requires a high degree of discretion on the part of the trial judge. *Adams,* 801 F.2d at 971; *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986); *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1437 (7th Cir.1986). Thus, the trial court's determi-

nation as to whether an injunction should issue is given substantial deference on review. *Adams,* 801 F.2d at 971; *A.J. Canfield,* 796 F.2d at 906; *Lawson Products,* 782 F.2d at 1437; *Roland Machinery,* 749 F.2d at 390.

■ The court finds that plaintiffs are unable to meet their burden of establishing the necessary elements for a preliminary injunction. First, the plaintiffs do not have a reasonable likelihood of success on the merits. The PMPA provides that once the franchisee establishes nonrenewal of the franchise, the franchisor bears the burden of establishing as an affirmative defense, "that such nonrenewal was permitted under section 2802(b) or 2803 of this title...." 15 U.S.C. § 2805(c); *see Brach,* 677 F.2d at 1219. The court concludes that plaintiffs are unlikely to succeed on the merits because Lake Shore appears to have justifiable grounds for nonrenewal under § 2802(b).

Lake Shore's grounds for nonrenewal, as simply stated in the January 11, 1990 notice, are that Lake Shore "determined that in the normal course of business the continuation of said lease is likely to be uneconomical to Lake Shore Petrocorp." In its Response to plaintiffs' motion for preliminary injunction, Lake Shore explains why renewal of the lease would be uneconomical:

> Plaintiff's failure to agree to changes in the franchise which LAKE SHORE determined necessary, in the ordinary course of business, to-wit: the addition of a convenience store on the premise [sic] to be built and operated by LAKE SHORE, at its expense and increased rental.

■ Lake Shore's determination that renewal of plaintiffs' franchise was likely to

---

these negotiations. To the extent that they were represented by counsel, plaintiffs did not need a summary of the PMPA in order to ascertain their rights.

**8.** Further, plaintiffs would only be prejudiced by Lake Shore's failure to provide the statutory summary if this failure prevented plaintiffs from asserting a valid right of which they were

unaware. However, because this court finds that Lake Shore's nonrenewal was permissible under the statute (discussion *supra*), plaintiffs had no substantive right under the PMPA to prevent the expiration of the Agreement. Thus, not only were plaintiffs effectively informed of their rights through counsel, but plaintiffs here had no right to prevent nonrenewal in any event.

be uneconomical—in light of the parties' failure to agree on changes to the provisions of the franchise agreement, provides valid grounds for nonrenewal under § 2802(b)(3)(A). Section 2802(b)(3) states that:

> For the purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:
>
> (A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—
>
> (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
>
> (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

15 U.S.C. § 2802(b)(3). The legislative history of the PMPA does not discuss what is meant by the term "in good faith and in the normal course of business" for the purposes of this provision. However, the Senate Report does discuss the meaning of this term as it is used in § 2802(b)(3)(D)(i)(IV). The "good faith" requirement is "meant to preclude sham determinations from being used as an artifice for termination or non-renewal." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 896. The "normal course of business" language, on the other hand, requires that "the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary of discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself." *Id.* The court finds these legislative remarks equally applicable to the "good faith" and "normal course of business" language in § 2802(b)(3).

■ Nothing in the pleadings indicates that the changes and additions to the franchise agreement were not proposed by Lake Shore in good faith and in the normal course of business. Nor do the facts before the court indicate that the changes and additions were proposed for the purpose of preventing the renewal of the franchise agreement. On the contrary, the plaintiffs' own pleadings indicate that when these changes were proposed, Lake Shore genuinely hoped that the plaintiffs would accept its proposal. In their Reply Memorandum, plaintiffs contend that *after* they refused to sign the proposed renewal agreement, Lake Shore "manufactured reasons for nonrenewal." Reply Memorandum, p. 4. Ironically, once plaintiffs failed to accept a good faith renewal proposal, Lake Shore would not need to "manufacture" a reason for nonrenewal, as plaintiffs' failure to accept its offer is itself a permissible reason for nonrenewal.[9]

■ Although plaintiffs characterize Lake Shore's renewal proposal as "oppressive and unfair" (Reply Memorandum, p. 4), they do not argue that the offer did not reflect a good faith determination made in the normal course of business. Arguably, changes in a franchise agreement proposed by a franchisor are more likely to benefit the franchisor than the franchisee; indeed, the proposed changes may not be designed to benefit the franchisee at all. However, the relevant inquiry under the PMPA is not the potential effect of the renewal agreement on the franchisee. Rather, the relevant inquiry is whether the proposed changes in the franchise agreement were designed by the franchisor in bad faith, as a pretext for preventing the renewal of the franchise relationship.

■ Plaintiffs also attack the substance of Lake Shore's determination that without the proposed changes, continuation of the Agreement would be uneconomical. They argue that Lake Shore's determination is

---

9. Assuming *arguendo* that after plaintiffs failed to accept the terms of the renewal agreement, Lake Shore attempted to manufacture improper additional reasons for nonrenewal, that misplaced effort would not detract from the validity of its original proper reason for nonrenewal. In other words, Lake Shore's valid reason for nonrenewal is no less valid because Lake Shore did not, at first, recognize it as such.

"unsubstantiated" and "untrue" (Complaint, ¶ 12) and that Lake Shore "has not shown precisely how the operations are economical" (Reply Memorandum, p. 8). However, these arguments do not address the relevant statutory inquiry. As the legislative history makes clear, the court must not scrutinize the franchisor's business judgments; rather, it must evaluate the franchisor's intentions. Thus, the court is not concerned with whether the changes proposed by Lake Shore were objectively necessary to make the franchise economically worthwhile or whether the changes were somehow disadvantageous to the franchisees. The relevant inquiry here is whether the Lake Shore's proposed changes to the Agreement reflected a good faith effort to achieve a legitimate business purpose, or whether the changes were designed as a pretext to disenfranchise the plaintiffs.

On the submissions before the court, it appears that the changes in the franchise agreement clearly were not designed as a pretext for nonrenewal. This conclusion is supported by the affidavit of Douglas Griffin, which states that after plaintiffs refused to agree to the modifications in the franchise agreement, Lake Shore was able to negotiate a lease of the premises with another party on substantially the same terms offered to plaintiffs. (Lake Shore has attached to its Response a copy of the third party agreement as well as a copy of the renewal agreement which it had offered to plaintiffs.) That Lake Shore offered to third parties contact terms similar to those rejected by plaintiffs is strong evidence that Lake Shore's proposed changes to plaintiff's Agreement were nondiscriminatory. This court therefore concludes that Lake Shore's proposed changes were offered to plaintiffs for the purpose of implementing those changes and not for the purpose of not renewing the plaintiffs' Agreement.

Plaintiffs also fail to establish that they have no adequate remedy at law and will be irreparably harmed if the injunction does not issue. The affidavit of Richard Ekstrom lists six respects in which plaintiffs allege they will incur irreparable injury if the injunction does not issue:

a. We will incur overwhelming costs in removing the equipment which I own on the premises;

b. The substantial and continuing investments made in the franchise premises will be lost;

c. The growing business value of the operations on the franchise premises will be destroyed.

d. Our current employees will likely lose their jobs;

e. We will be unable to continue my business in the franchised station; and

f. It will become virtually impossible for us to finance the cost of litigation with LAKE SHORE PETRO CORP. in the absence of business revenue.

Affidavit of Richard Ekstrom, ¶ 15.

█ The items of injury listed under subparagraphs a, b, and c all reflect monetary injuries which are insufficient for finding irreparable harm requisite to the issuance of a preliminary injunction.[10] *See, e.g., American Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir.1980) (mere monetary injuries, however substantial, are not enough to constitute irreparable harm); *Signode Corp. v. Weld–Loc Systems, Inc.*, 700 F.2d 1108, 1111 (7th Cir.1983) (defendant's ability to compensate plaintiff with money damages precludes issuance of preliminary injunction); *Terson Co. v. Pension Benefit Guaranty Corp.*, 565 F.Supp. 203, 207 (N.D.Ill.1982) ("Monetary damages, including loss of profits or temporary loss of income do not constitute irreparable injury").

█ Subparagraph d does not go to the issue of irreparable harm to the plaintiffs because it alleges economic harm to plain-

---

10. The court also notes that plaintiffs' allegations of economic hardship are undermined by the fact that the future tenants have "offered to purchase plaintiff's equipment and cover any loss of profits." Griffin Affidavit, ¶ 2(i). This

statement is supported by plaintiffs own affidavit in which Richard Ekstrom acknowledges that the future tenants called Richard Grotemeyer to inquire about purchasing plaintiffs' carwash equipment.

tiff's individual employees, rather than to plaintiffs themselves. Although this alleged harm may weigh in plaintiffs' favor under the public interest prong of the preliminary injunction analysis, it has limited relevance on the issue of irreparable harm.

Subparagraph e also alleges a harm which appears to be economic in nature, and therefore compensable in an action for damages. Plaintiffs have not alleged anything unique about their business which would make its loss uncompensable with a sufficient damage award.

 Finally, the court finds that the harm listed in subparagraph f, by itself, is insufficient to meet plaintiffs' burden of establishing irreparable harm. In so holding, the court notes that if plaintiffs indeed will have difficulty financing the cost of this litigation after vacating the leased premises, they are largely responsible for bringing this burden upon themselves. Plaintiffs received the notice of nonrenewal over eight and a half months prior to the expiration of the Agreement.[11] Had plaintiffs filed suit expeditiously, they would have had an opportunity to litigate this action before the Agreement expired and while business revenues were available to fund the litigation.[12] In short, plaintiffs sat on their rights and failed to take the steps necessary to avoid the bind from which they now seek relief. Their motion for preliminary injunction is denied.

IT IS SO ORDERED.

---

11. Specifically, plaintiffs had 262 days of notice—far more than the 90 days required by the PMPA. 15 U.S.C. § 2804(a)(2).

12. According to oral representations made by plaintiffs' counsel to this court, plaintiffs withheld filing this suit as long as they did in the hopes that their disputes with Lake Shore could be resolved without litigation. Ironically, plaintiffs claim in their motion that Lake Shore has been dealing with them in bad faith all along, and had never made any good faith offer for renewal (see Reply Memorandum, p. 3–4, ¶ 6). The court finds it difficult to reconcile these two assertions. However, even assuming that plaintiffs had some tactical reasons for choosing not to institute this action sooner, they made this choice in the face of the risk that the Agreement would expire before the controversy could be resolved.