FORT WAYNE WOMEN'S HEALTH ORGANIZATION, Ulrich Klopfer, M.D. and Jane Doe(s), Plaintiffs,

v.

WENDELL BRANE, Bryan J. Brown, Ellen Brown, Northeast Indiana Rescue, et al., Defendants.

Civ. No. F90–66.

United States District Court, N.D. Indiana, Fort Wayne Division.

May 8, 1990.

Alan M. Pollack, Pollack & Greene, New York City, Arnold H. Duemling, M.P. Smith & Associates, Fort Wayne, IN, for plaintiffs.

Roland W. Gariepy, Fort Wayne, IN, for defendants Wendell Brane and Bryan J. Brown.

T. Russell Strunk, Jr., Fort Wayne, IN, for defendant Ellen Brown.

Daniel G. Heath, New Haven, IN, for defendant Northeast Indiana Rescue.

James P. Fenton, Alan VerPlanck, Barrett & McNagny, Fort Wayne, IN, for intervenor defendant Journal Gazette.

### ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on plaintiffs' motion for a preliminary injunction filed on April 25, 1990, along with plaintiffs' complaint against the defendants in which they seek to permanently enjoin defendants from various activities at the Fort Wayne Women's Health Organization facility (the Clinic) located in Fort Wayne, Indiana, which activities are alleged to be unlawful. In an order entered on April 26, 1990, this court denied plaintiffs' request for a temporary restraining order also filed on April 25, 1990, because there was time to conduct a hearing with all parties present before any alleged unlawful action by the defendants was expected to occur and the court wished to give the defendants an opportunity to be heard before considering a grant of any emergency relief. A hearing on plaintiffs' motion for a preliminary injunction was held on May 3, 1990, at which the plaintiffs presented the testimony of several persons employed by the Clinic, including Susan Hill, president of the National Women's Health Organization and vice-president of the Fort Wayne Clinic; Dr. Ulrich Klopfer, the Clinic physician and Helen Sims, an LPN who is also administrator of the Clinic. Plaintiffs also presented the testimony of a Fort Wayne police officer; two former patients of the Clinic and a videotape of the defendants' activities on August 25, 1989. Defendants presented a videotape of the news media coverage of the August 25, 1989 activities along with the testimony of Fort Wayne Mayor Paul Helmke and Mary Yoder, a mother of four children.

### Preliminary Injunction Standard [1]

The Seventh Circuit has outlined the non-discretionary actions that a district judge must take when considering a motion for preliminary injunction. *Darryl H. v. Coler,* 801 F.2d 893, 898 (7th Cir.1986).

1. He must evaluate the traditional factors enumerated in the case law; whether there is an adequate remedy at law, a danger of irreparable harm, some likelihood of success on the merits. *See Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–88 (7th Cir.1984).

2. He must make factual determinations on the basis of a fair interpretation of the evidence before the court.

3. He must draw legal conclusions in accord with a principled application of the law.

*Id.* at 898. The court went on to state that "the district court must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and *the wild card that is the public interest."* *Id.* (emphasis added). Additionally, "the statutory grant of the power to issue a preliminary injunction carries with it the power to issue whatever ancillary equitable relief is necessary to the effective exercise of the granted power." *Federal Trade Com'n v. Elders Grain, Inc.,* 868 F.2d 901, 907 (7th Cir.1989).

In *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1432–35 (7th Cir.1986), the Seventh Circuit reviewed two of its prior opinions on the law of preliminary injunctions. *See Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984)

---

1. It is important to note at the outset of this order that this court is not deciding whether abortion is right or wrong. That is not the function of this court. Nor is anything stated in this order meant by this court to be an expression of any opinion on that issue. This order concerns the application of the appropriate legal standards for a preliminary injunction under the circumstances which were presented to this court by the parties.

and *American Hospital Supply Corp. v. Hospital Products Limited,* 780 F.2d 589 (7th Cir.1986). The court in *Lawson,* noted that both *Roland* and *American Hospital* make it clear that while preliminary injunctions are an equitable form of relief, they are an exercise of far-reaching power. *Lawson,* 782 F.2d at 1433. This court recognizes that preliminary injunctive relief invokes a far reaching power:

> The idea underlying these equivalent approaches is that the task for the district judge in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose. The judge must try to avoid the error that is more costly in the circumstances.

*Roland,* 749 F.2d at 388. *See also American Hospital,* 780 F.2d at 593. Thus, this court must choose the course of action that will minimize the costs of being mistaken.

*Lawson, Roland,* and *American Hospital,* all adopted a "sliding scale" approach where the possibility of mistake would be minimized by weighing the costs of injunctive relief against the benefits. This principle was stated in mathematical terms, in *American Hospital,* 780 F.2d at 593. The preliminary injunction should be granted if, but only if:

$$P \times Hp > (1 - P) \times Hd$$

The left hand of the equation is the magnitude of erroneously denying the injunction, arrived at by multiplying the probability that plaintiff will prevail at trial (P) by the harm to the plaintiff caused by the denial of the injunction (Hp). The right hand represents the magnitude of an erroneously granted injunction measured by multiplying the probability that the defendant will prevail at trial (1—P, the inverse of the plaintiff's probability of success) by the harm to the defendant caused by the granting of the motion (Hd). *Id.* at 593–94; *Lawson,* 782 F.2d at 1433–34. Obviously this formula is not a substitute for, but an aid to, judgment. *Id.* at 1434. A figure representing the probability of success, for example, can only be arrived at

through subjective estimate by the court. Nevertheless, the "sliding scale" approach is helpful and will be considered in determining whether plaintiffs are entitled to a preliminary injunction.

■ It is well established in the Seventh Circuit that the plaintiff has the burden of proving each of the factors enumerated in *Coler,* above. *Palmer v. City of Chicago,* 755 F.2d 560, 576 (7th Cir.1985); *Godinez v. Lane,* 733 F.2d 1250, 1257 (7th Cir.1984); *Technical Pub Co. v. Lebhar–Friedman, Inc.,* 729 F.2d 1136, 1138–39 (7th Cir.1984). These factors were set forth again by the Seventh Circuit in *Curtis v. Thompson,* 840 F.2d 1291 (7th Cir.1988) as:

> (1) that [she] has no adequate remedy at law;
>
> (2) that [she] will suffer irreparable harm if the preliminary injunction is not issued;
>
> (3) that the irreparable harm [she] will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;
>
> (4) that [she] has a reasonable likelihood of prevailing on the merits; and
>
> (5) that the injunction will not harm the public interest.

*Id.* at 1296 (quoting *Brunswick Corporation v. Jones,* 784 F.2d 271, 273–74 (7th Cir. 1986)). However, the Seventh Circuit has recently recognized that "irreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy." *Jennings Water, Inc. v. City of North Vernon, Ind.,* 895 F.2d 311, 318 at n. 6 (7th Cir.1989) (quoting 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2944 at 401 (1973)).

### Factual Background

The Fort Wayne Women's Health Organization operates a facility at 827 Webster St., Fort Wayne, Indiana (the Clinic). The Clinic is a women's health facility which conducts first trimester abortions and offers other gynecological services to women who reside in Northeast Indiana, Northern Ohio and

Southeastern Michigan[2]. Dr. Klopfer is the only physician servicing the Clinic. He has provided service to the Clinic for the past two and one-half years and for the past six months has commuted to Fort Wayne from Crete, Illinois once a week, on Thursdays, to perform abortions. The cost of an abortion at the Clinic is approximately $250.00, however, the fee may be reduced for women who are indigent. The Clinic is the only facility in the Fort Wayne area which conducts first trimester abortions[3], although there are some Fort Wayne physicians who will perform abortions at a significantly higher cost to private patients[4]. The Clinic receives about 75–80% of its total income from the performance of abortions.

The usual routine for a woman wishing to have an abortion at the Clinic is to call in advance and schedule an appointment for the procedure. Patients are told to arrive for their appointment with another person, such as a husband, boyfriend, or relative. Since there are usually anti-abortion protestors present when the women arrive on procedure day, the Clinic provides volunteers who act as escorts for their patients from the nearby parking lots to help them enter the facility. The escorts are necessary to shield the patients from the vociferous anti-abortion rhetoric of the encroaching protestors[5] and to allow the patients to gain access to the Clinic[6]. The escorts totally surround the patient as they walk with her towards the facility and into the building. At times the escorts have had to use cardboard boxes and blankets to shield the patients visibly from the protestors who take pictures of the women entering the Clinic. The protestors approach the patients in groups of as many as twenty protestors per patient. The protestors push into the escorts who surround the patient, trying to stop the movement towards the Clinic so they can talk to the patient. Because the protestors are unable to get to the patient to talk to her, they shout their message that the patient's baby has a heartbeat and that the patient is murdering her baby. The protestors also shove the escorts as the protestors try to pass anti-abortion literature to the patient. In response to the actions of the protestors, the escorts chant and shout back at the protestors to drown out their

**2.** Susan Hill testified that approximately 10% of the Clinic's patients come from Michigan and Ohio.

**3.** In their post-hearing brief, defendants argued that there was evidence that other facilities advertise for abortions in the area, that local doctors travel to adjacent areas to perform abortions, that other clinics perform abortions within the area and that Dr. Klopfer runs a clinic in the adjacent area. None of these contentions is an accurate reflection of the evidence presented at the hearing. Although defense counsel questioned several of plaintiffs' witnesses regarding other advertised facilities in the Fort Wayne area, no one acknowledged having seen any advertisement for any method of obtaining an abortion in the area other than by the Women's Health Organization facility. Furthermore, defendants' apparent concept of "the area" is not reasonable for the purpose of Fort Wayne residents seeking outpatient surgical procedures. The evidence clearly established that the closest other facilities in Indiana which perform first trimester abortions are located in South Bend, Gary/Merrillville and Indianapolis. No person intending to have a tonsillectomy or hernia repair performed on an outpatient basis would consider a clinic from 80 to 120 miles away as in "the area". There are obvious health risks involved in any surgical procedure which may necessitate an urgent return to the performing facility which could not be accomplished by such a distance. There is no reason to believe that a different degree of reasonableness would apply to defining "within the area" for obtaining the outpatient surgical procedure known as an abortion.

**4.** Susan Hill testified that she knew of some Fort Wayne doctors who provided abortions to their private patients. Mary Yoder testified that she called Dr. Merrill Rusher's office on May 2, 1990 to schedule an abortion. Although she had never been a patient of Dr. Rusher before, she stated that she was told that she would be required to make two appointments and that the cost would be $520. She then scheduled one appointment on May 7, 1990 and one on May 8, 1990. Exactly where the abortion would be performed was not stated.

**5.** Officer Walsh of the Fort Wayne Police Department testified that one woman, who was not a Clinic patient, was confronted by numerous demonstrators shoving literature at her three weeks in a row as she exited her parked car in a lot near the Clinic. When she complained to Officer Walsh, he told her that she would have to go to the department and press charges.

**6.** Jane Doe and Jane Roe both testified that they would not have been able to get past the protestors and into the Clinic had it not been for the efforts of the escorts.

rhetoric. At this point, the confrontation becomes a very loud shouting and shoving match which can be heard more than a city block away. When the patient finally gets into the Clinic, she is visibly shaken and too upset to proceed with the necessary paperwork and testing. Unfortunately, the dilemma for the patient and her family is not always over once she has successfully entered the Clinic. On numerous occasions, protestors have followed the patients when they left the Clinic—to the parking lot, to their places of employment and once, to a local fast food restaurant. Protestors have also been observed following family members back to the parking lots after they left the patients at the Clinic.

Since the Clinic opened in 1978, over 100 demonstrations protesting the performance of abortions have taken place in front of the Clinic. The number of anti-abortion protestors at these demonstrations has ranged from as few as five to as many as 700. Typically, demonstrations only occur on "procedure" day, which is Thursday, when abortions are performed. The typical demonstration consists of the sidewalk counseling described above, picketing, praying and singing, oftentimes at a very high volume.

However, on April 21, 1989, June 10, 1989 and August 25, 1989, three demonstrations were conducted with the express intent of blocking the entrances and exits of the Clinic to stop anyone from entering the facility[7]. These particular demonstrations were called "rescues" and were organized by a group called Northeast Indiana Rescue (NEIR) in accordance with procedures established by a national organization known as Operation Rescue.

According to plaintiffs' exhibit number 3, a recent publication apparently distributed by NEIR, a rescue is "a gallant move on the part of Christian men and women throughout the United States to save as many unborn babies as possible by placing their bodies between the abortionist and the innocent ba-

bies." Susan Hill testified that, having observed other Operation Rescue demonstrations at similar abortion facilities around the country, her definition of a rescue was an intentional blockade of ingress and egress to a facility by anti-abortion demonstrators in an effort to close the facility. She stated that she recognized the activities of the Fort Wayne rescues as common Operation Rescue tactics. Among the strategies she associated with Operation Rescue demonstrations were designation of a leader for the days' activities who orchestrated the group's movements, a police liaison person designated to deal with and negotiate with police to buy time for the protestors to get in position, a designated press spokesperson who was the only demonstrator allowed to speak for the group to the press, several scouts sent in advance of the arrival of the demonstrators to "check out" the location, two-way cellular telephones/radios used by the leaders of the rescue to keep in touch with activities which were occurring out of their sight, mass movement of the entire group of protestors from several different directions at once, physical blocking of the facility doorways by ordering the largest bodies to sit there, ordering of the demonstrators to sit as close to each other as humanly possible and to link arms to be impenetrable and directing demonstrators where to sit to maintain a solid human blockade 7 to 8 rows deep.

The anti-abortion demonstrations held on April 21, 1989, June 10, 1989 and August 25, 1989 were "rescues" as distinguished above from the typical anti-abortion demonstration. The testimony was unequivocal that all three rescues followed an identical format except that the numbers of participants grew with each successive rescue. The April rescue brought out several hundred demonstrators and resulted in the arrest of 100 people. The June rescue involved between 300 and 500 protestors, resulting in 135 arrests. By the August rescue there were as many as 700 demonstrators present and the activities resulted in 175 arrests. Along with plaintiffs'

7. The video of the August rescue clearly showed that the practical effect of the rescue was to also stop anyone from exiting the Clinic for the period of time that it took the protestors to get into their positions in front of the building. It was not until after the crowd of demonstrators was situated in a human blockade of the Clinic that defendant Brane told the seated crowd to let people out but not let anyone in.

complaint, plaintiffs filed the affidavit of Susan Hill in which she stated that she had been informed by Michael McAlexander, Fort Wayne Public Safety Director, that he had been advised that a further rescue was to take place in "early May" and involve over 1000 protestors.

All the rescues occurred following the same general sequence of events. Some time prior to the scheduled rescues, anonymous phone calls would be sent to the Clinic and to the police department warning everyone that a rescue was being planned. At times it was merely rumored that there was an impending rescue planned. Regardless of how the information was spread, at some time prior to each of the foregoing rescues, the police and the Clinic had prior notice of the day the rescue was scheduled to occur. Based on the rumors, the police department took steps to have additional police available and stationed at the Clinic. Forty to fifty officers were called in to work on the days of the rescues, many of them required to work overtime. The Clinic staff also took steps in preparation for the rescues by arriving early and sometimes spending the entire night preceding the rescue at the facility. Safe houses were arranged for keeping patients scheduled for abortions on the days of the rescues. Each time there was notice of a scheduled rescue, similar to the notice of the impending rescue, it occurred.

The rescues began with several known anti-abortion demonstrators arriving at the Clinic in advance of the entire group of protestors. These early arrivals wandered around the facility grounds apparently taking note of the physical surroundings and who was present. Although the amount of time varied before the crowds arrived at each rescue, at some point large groups of individuals appeared from several different directions, all moving in unison towards the front of the Clinic. A few of the individuals, some of whom were already at the Clinic before the crowds arrived, began directing the oncomers as to where to go and when to sit. First, some individuals in the crowd were all directed to sit on the sidewalk in front of the Clinic, blocking free passage to the Clinic property from the street. Then, other individuals were directed to go onto the lawn and up to the steps and doors of the Clinic and sit as close to each other as possible. Some protestors crawled under police barricades which had been set in place prior to the arrival of the crowd. After a few moments of mass movement, however, several individuals disassembled the barricades and resumed their forward motion unhindered. Some of the barricades were broken down. Police tape cordoning off the area was completely ignored. During this organized movement onto the Clinic property, the pro-choice demonstrators who were still across the street from the Clinic began screaming at the police to stop the crowd from getting on the Clinic property. Despite the fact that there were many groups of police officers standing in the street watching the crowd move into position, none of them made any attempts to stop any individuals in the crowd or made any arrests until after all protestors were seated.[8] Once seated, the demonstrators completely blocked access to the building. Because the building sets close to the sidewalk, the protestors were able to fill the entire space from the front of the building to the curb line.

Once the crowd was positioned, the Chief of Police informed the protestors that they would have ten minutes to leave or face arrest for trespassing. After the ten minutes passed, police officers began the arrest process. Prior to physically removing any individual protestor, the police once again gave them the opportunity to voluntarily get up and leave and avoid arrest. Several protestors who took advantage of that option repositioned themselves in another location where a protestor had already been carried off. This action allowed the protestors to deny access to the facility for a longer period of time once the arrest process began.

8. Officer Walsh was present on the Clinic property on horseback when the crowd began to position itself. He did make several attempts to stop passage of the crowd, however, he was ordered by an unidentified policeman to leave the area in front of the Clinic when it appeared that the demonstrators were in danger of injury from the horse because of the close proximity of the oncomers.

Teams of five officers were required to remove each individual protestor because the protestors had been instructed to "go limp" when being arrested. One officer was required to be a record keeper for booking purposes while each of the other four officers grabbed a limb and lifted the protestor. During the first two rescues, the protestors walked onto the police bus once they were carried to it and set down. During the August rescue, however, the police had to carry most of the arrested protestors onto the bus also. The arrest process took over three and one-half hours during the April rescue. By the June rescue, the police were experienced and although more arrests were made, the process took little more than two and one-half hours. During the August rescue, the process again took over two and one-half hours even though the police officers were getting faster because there were more arrests made and additional time was required to carry the protestors onto the police bus.

From the start of the rescue, the street in front of the Clinic remained closed to traffic. The Clinic itself was blocked from access and several patients and staff who were inside the Clinic at the outset of the movement felt trapped inside. Helen Sims, administrator of the Clinic, asked to be allowed out of the Clinic during the August protest, and although granted such passage, her exit was clearly hampered by the mass of people between her position at the door of the Clinic and her desired goal of getting across the street.

The effect of the rescues on the Clinic was to delay the daily routine scheduled for those days. The Clinic physician was unable to get into the Clinic until after all the protestors were removed. Several patients at the Clinic prior to the rescues were forced to remain inside and wait for several hours before they were able to see the doctor. Many more patients were denied access to the Clinic because the police would not allow any attempts at entrance to the facility while the protestors were on the grounds. Some of the patients scheduled for appointments on the rescue days called and cancelled their appointments for fear of the events taking place. Although some of those patients who cancelled appointments on rescue days later rescheduled, there were many who never showed up or rescheduled. The number of those who never showed up for appointments was higher on the rescue days than on normal business days. According to Susan Hill's affidavit and her testimony in court, the objective of the impending rescue is to close down the Clinic for the entire day.

Wendell Brane, Bryan Brown and Ellen Brown have been clearly identified as organizers and leaders of the rescues. They were observed by Clinic staff and police as active participants at every rescue. In the videotape of the August 25, 1989 rescue, this court could clearly see and hear for itself the leadership roles being performed by the named defendants. Wendell Brane directed demonstrators verbally and by motions to cross the "no trespassing" signs and sit along the wall of the facility and in front of the doorways. During the movement of rescuers onto the Clinic property, Brane spoke into a two-way telephone/radio on occasion and placed a receiver in his ear at one point in time. Once several rows of bodies were in place in front of the Clinic, Brane was heard to instruct the crowd not to let anyone in and to lock arms to maintain a human blockade. Brane also personally interfered with a mounted police officer who was trying to keep the demonstrators off the property immediately in front of a doorway. He was seen pushing against the horse and orally addressing the officer, which diverted the officer's attention from the protestors who were crawling under and around the horse. The officer was eventually told by a fellow officer to leave the area because of the danger posed to the demonstrators who were bumping up against the horse and crawling under it. Ellen Brown was also seen motioning the demonstrators to sit in certain places and ordering them to move closer together. She was one of the few demonstrators who moved about once the crowd was situated in a human blockade of the Clinic several rows deep. Bryan Brown was clearly introduced as one of the leaders of the rescue by an unknown person. Also, the crowd could be heard shouting for him to do something because he was in charge. Furthermore, Bryan Brown wore an identification tag simi-

lar to those worn by many of the protestors. Bryan's tag identified him as "Baby Doe # 2".

The observations on the video were in addition to the testimony of Officer Walsh who stated that Brane and Brown introduced themselves to him as the persons in charge of the rescues and told him that if he had any complaints he should take them up with either Brane or Brown.

Wendell Brane and the Browns are also clearly participants in NEIR. The August rescue was clearly conducted under the direction and leadership of Brane and the Browns and they were seen participating at the other rescues. Each rescue has been attributed to the efforts of NEIR. The apparent sole purpose of the organization is to promote such rescue operations in Northeast Indiana. Furthermore, NEIR apparently published a Spring 1990 newsletter, admitted as plaintiffs' exhibit number 4, in which many references are made to the Operation Rescue attempts around the country. The newsletter includes an article apparently written by defendant Brane which discusses his recent arrest for battery in connection with "talking to a client going into the clinic." The newsletter states that there is to be an NEIR Worship Rally at the Calvary Temple on Saturday, May 5, 1990. The newsletter also sets out a calendar of May events and indicates that May 10, 1990, May 17, 1990, May 24, 1990 and May 31, 1990 are "Webster Street Procedure Days Jericho Marches ... or are they Rescue Days???" A flier, plaintiffs' exhibit number 2, was inserted in the newsletter which indicates in very large, bold type that the date of the next rescue will be announced at the worship rally on May 5, 1990. Directly under that notice are the statements, "Yes, there will be another rescue. Yes, the time is getting close. Yes, it will be our biggest ever." Additionally, the flier contains a "newsflash" concerning the pending action in this court and states in part:

> Yes, NEIR and various individuals are being sued.
>
> * * * * * *
>
> No, we're not surprised or afraid. Yes, we will continue to rescue babies and mothers

... And yes, we're going to fight this suit ...

* * * * * *

Now, you may be asking yourself (and may be thinking about calling Wendell or Bryan or Ellen and asking them):

> * Are Bryan and Ellen and Wendell going to jail for a really long time and after that have to live in an alley somewhere since they'll lose everything they once owned?

* * * * * *

It has been reported that the aforementioned sued people ...

Based on the factual recitation of events at the rescues and the documents received into evidence, it is perfectly clear to this court that defendants Wendell Brane, Bryan Brown and Ellen Brown were leaders of the August 25, 1989 rescue and were active participants in the prior two rescues. Furthermore, it is clear that the rescues were an attempt to block anyone's access to the abortion facility and that the named defendants and the organization known as NEIR were jointly responsible for the rescues.

Plaintiffs have come to this court seeking a preliminary injunction on the basis of rumors that a fourth rescue is being planned for early May, 1990. Clearly, the most recent publications of NEIR support this rumor. This court denied plaintiffs' request for a temporary restraining order because there was time to allow the defendants to be heard and present their version of the facts which were alleged. Although the named defendants were present in court throughout the hearing, none of them chose to testify, none of them has submitted an affidavit denying any of the alleged activities or their involvement in same, nor have they presented any evidence to rebut plaintiffs' contentions regarding the impending rescue planned for early May, 1990, or their involvement in same.

*Arguments*

The complaint underlying this preliminary injunction action, which seeks permanent injunctive relief, alleges five causes of action; two federal law claims and three state tort

claims. It is clear that this court has jurisdiction over these claims based on plaintiffs' federal claim under 18 U.S.C. § 1962 (RICO) and 42 U.S.C. § 1985(3) and the doctrine of pendant jurisdiction, although there is a question of whether the claim under 18 U.S.C. § 1962 would entitle plaintiffs to private injunctive relief. Plaintiffs' state law claims allege trespass, tortious interference with business and public nuisance.

Defendants apparently believe that it is their duty as Christians to stop abortions from taking place because such activity is equivalent to murder. Defendants apparently further believe that they are justified in using whatever means are necessary, both legal and illegal, to prevent such "killings". Defendants' beliefs are clearly protected by the First amendment, however, some of their activities involved in expressing those beliefs are not equally protected.

■ At the hearing held on May 3, 1990, the defendants' counsel suggested that one of the ultimate issues for the court to decide was the "legitimacy or illegitimacy" of the abortion protestors' actions. The defendants' counsel takes the position that the defendants' actions are legitimate and relies on the "justification" defense, also known as the "necessity" defense, to support this position. The defense of "necessity" has been recognized in *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), with two conditions: (1) the defendants must reasonably believe their criminal conduct is "necessary to avoid a harm more serious than that sought to be prevented by the statute defining the offense," and (2) there must be no "reasonable, legal alternative to violating the law." 444 U.S. at 410, 100 S.Ct. at 635. As the *Bailey* court stated:

Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defenses will fail.

*Id.*

■ In the present case, it is impossible to argue that there are not reasonable alternatives to violating the law. There are numerous opportunities for the propagation of the anti-abortion message: by petitioning the legislature; by speech in all manner of public places, including the area of the Clinic; and by the release of information to the media, to name only a few. Consequently, the defendants' belief, no matter how sincere, that as Christians they must take it upon themselves to prevent women from having abortions, does not justify their unlawful actions. As the Seventh Circuit has stated in *United States v. Quilty,* 741 F.2d 1031, 1034 (7th Cir.1984):

We recognize that appellants may well view themselves as inheritors of a tradition of civil disobedience which historically has encompassed American political dissent from Thomas Paine to Henry David Thoreau to Martin Luther King, Jr. It would be hard to argue that appellants' cause—apparently a general effort to stop [abortions]—is not comparable in significance to those which motivated these just named figures in their respective causes. Further, there is nothing in this record to show that their conduct was in any respect violent or disruptive. These considerations, however, do not alter the duty of the federal courts to enforce the laws established by a Congress elected by the people, under interpretations which the Supreme Court has upheld as consistent with the United States Constitution.

Similarly, in the present case, it is the duty of this court to enforce the rights of women who wish to have abortions as those rights are established by our Constitution and interpreted by our Supreme Court as well as to enforce all of the laws of the land which protect both the plaintiffs and the defendants.

*Preliminary Injunction Analysis*

■ After thorough research, this court has found no Seventh Circuit cases which deal with a court's authority to grant a preliminary injunction under the circumstances of this case. There are, however, two very recent cases from the Second Circuit Court of Appeals and the Ninth Circuit Court of Appeals which are dispositive of the issues presently before this court. There are also

several very recent opinions from various jurisdictions, both state and federal[9], which also recognize the appropriateness of an order restraining similar activities of anti-abortion protest groups. It is worth noting that defendants' counsel has not submitted to this court a single decision in which an injunction has been denied under these circumstances, despite ample opportunity to do so.

In *N.Y. State Nat. Organization for Women v. Terry*, 886 F.2d 1339 (2nd Cir.1989), the court affirmed the grant of a permanent injunction against Operation Rescue conduct[10] on two abortion facilities in New York. The court found that the activities of Operation Rescue clearly violated 42 U.S.C. § 1985(3) because they interfered with the interstate right to travel of women seeking an abortion who had come to the facilities from out of state. *Id.* at 1359–61. The court also upheld the district court's grant of summary judgment on plaintiffs' trespass and public nuisance claims. *Id.* at 1361–62. The court further held that the injunction was not an improper restriction on defendants' First Amendment rights, stating:

Yet, the First Amendment may not be read to protect a person's right to express their views at any time, in any manner, and in any place of their choosing. *See Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563–64 [69 L.Ed.2d 298] (1981). Operation Rescue's activities are subject to reasonable time, place and manner restrictions so long as the limitations are (1) content-neutral, (2) narrowly tailored to meet a significant government interest, and (3) leave open ample alternative means of communications. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69 [82 L.Ed.2d 221] (1984); *Heffron*, 452 U.S. at 647–48, 101 S.Ct. at 2563–64; *Grayned v. City of Rockford*, 408 U.S. 104, 115–17, 92 S.Ct. 2294, 2302–04, [33 L.Ed.2d 222] (1972). Assuming that a regulation is content-neutral, the reasonableness of the regulation will often depend upon "[t]he nature of a place [and] 'the pattern of its normal activities'" *Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303 (quoting Wright, *The Constitution on the Campus*, 22 Vand. L.Rev. 1027, 1042 (1969)).

*Id.* at 1363.

In *Portland Fem. Women's H. Ctr. v. Advocates for Life*, 859 F.2d 681 (9th Cir.1988), the court affirmed, with modification, a preliminary injunction which enjoined the "defendants, their agents, servants, employees, and all persons, groups, and organizations acting in concert with one or more of the defendants" from:

(1) obstructing the free and direct passage of any person in or out of the Portland Feminist Women's Health Center (Center);

(2) demonstrating or distributing literature on the Foster Road sidewalk in front of the Center in a rectangular zone that extends from the Center's front door to the curb and twelve and one-half feet on either side of a line from the middle of the Center's door to the curb;

(3)[11] shouting, screaming, chanting, yelling, or producing noise by any other means, in a volume that substantially interferes with the provision of medical services within the Center, including counseling;

(5) trespassing on Center property;

---

9. *See Town of West Hartford v. Operation Rescue, et al.*, 726 F.Supp. 371 (D.Conn.1989); *Aradia Women's Health Ctr. v. Operation Rescue, et al.*, No. C88–1539R (W.D.Wash., July 7, 1989); *Roe v. Operation Rescue, et al.*, 710 F.Supp. 577 (E.D.Pa.1989); *Nat'l Abortion Federation v. Operation Rescue, et al.*, No. CV89–1181–AWT (C.D.Cal., March 15, 1989); *Cousins, et al. v. Terry, et al.*, 721 F.Supp. 426 (N.D.N.Y.1989); *City of Atlanta v. Operation Rescue, et al.*, No. D–61462 ([Ga] Superior Court, Fulton County, March 28, 1990); *Chico Feminist Women's Health Ctr. v. Scully, et al.*, 208 Cal.App.3d 230, 256 Cal.Rptr. 194 (App.1989).

10. The conduct complained of in the New York case is very similar to the activity taken by the defendants at the Clinic in Fort Wayne. The defendants in New York blockaded the abortion facilities and trespassed on the plaintiffs' property in an effort to prevent women from obtaining abortions.

11. The court combined the district court's original paragraphs numbered 3 and 4 into this new paragraph number 3. *Id.* at 687.

(6) damaging the property of the Center, its employees or clients; and

(7) interfering with the Center's receipt of public utility services.

*Id.* at 684. There was not a staged Operation Rescue at this facility; however, defendants and others regularly gathered at the abortion facility to demonstrate against abortions on the days such procedures were performed. These regular demonstrations included the following conduct in common with the activities at the Clinic in Fort Wayne:

> Demonstrators often crowd around the Foster Road entrance to the Center ... Demonstrators scream and yell at Center clients, escorts, and staff, sometimes inches away from their faces, as they enter and exit the Center. Demonstrators press literature on clients and employees who have indicated they do not wish to talk or receive such literature. Demonstrators bump, grab and push persons wishing to enter the Center in an effort designed to impede passage. Demonstrators chant, shout, and scream from the sidewalk alongside the Center in a manner which is calculated to be heard inside the Center on the second floor where medical procedures are being performed.

*Id.* at 683 [12]. Keeping in mind the vital interests served by allowing political speech in a public forum, the court found the injunction to be an appropriate reasonable time, place and manner restriction because it was not content-based. *Id.* at 686. The court stated:

> We have no doubt that the interests that render reasonable the regulation of disruptive expression outside schools and courthouses also operate to allow regulation of disruptive expression outside a clinic where medical services including surgery are offered.

*Id.* The court went on to comment that inextricably entwined with the interest of the district court in protecting the rights of the

clinic and its patients from irreparable harm was "the interest in protecting the ability of the clinic to provide medical services free from interference that may endanger the health and safety of its patients." *Id.*

Applying the Seventh Circuit preliminary injunction standard set forth earlier in this order, it is clear that plaintiffs have fulfilled their burden. (1) Plaintiffs have no adequate remedy at law—plaintiffs will not be able to exercise their constitutional right to have first trimester abortions, and choose the place and time for these abortions, unless an injunction is issued ordering the defendants to refrain from blockading the Clinic and otherwise interfering with the plaintiffs' ingress and egress from the Clinic. (2) Plaintiffs will suffer irreparable harm if the preliminary injunction is not issued—the ability of the clinic to provide medical services free from interference that may endanger the health and safety of its patients is seriously jeopardized by the conduct of defendants during the rescues and because of the noise and physical jousting generated by the confrontations between the protestors and the escorts during the usual demonstrations. Furthermore, there simply is no adequate remedy at law to compensate the patients for the interference with their right to choose to have this procedure done at this clinic at the time chosen. This negates the need to prove the irreparable harm requirement. *Jennings Water, Inc. v. City of North Vernon, Ind.,* 895 F.2d 311, 318 (7th Cir.1989); 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2944 at 401 (1973). (3) The irreparable harm the plaintiffs will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendants will suffer if the injunction is granted—the evidence submitted in this case clearly shows that the defendants have not articulated an irreparable harm that they will suffer if the preliminary injunction is granted [13]. (4) Plaintiffs have a reasonable likelihood of prevailing on the merits—the

---

12. There was testimony by the Clinic staff and former patients that the protestors could be heard shouting inside of the Clinic where the abortions are performed.

13. The court recognizes that the defendants are asserting that the irreparable harm that will occur if the preliminary injunction is granted is that fetuses will be aborted. However, the defendants herein do not have standing to assert the rights of unborn fetuses.

facts of this case strongly suggest that the defendants have violated § 1985(3) and that the plaintiffs will be entitled to a permanent injunction. Susan Hill testified that approximately 10% of the Clinic's clientele come from out-of-state to have abortions performed at the Clinic. Also, plaintiffs have included several pendent state law claims in their suit: trespass, tortious interference with business, and public nuisance. Clearly the evidence submitted supports the trespass claim. The uninvited protestors sat in groups on Clinic property immediately behind a "no trespassing" sign and refused to leave of their own free will. Additionally, the activities of the protestors supports a tortious interference with business claim. The protestors prevented the Clinic's business from being conducted in a normal manner until after the protestors were forcibly removed from the property. Finally, the activities of the protestors support a claim of public nuisance. The protestors have disrupted the peace with their excessively loud yelling/chanting, they have obstructed traffic, and they have trespassed on the property of neighboring residents. (One neighbor went so far as to provide trespassing protestors with a cold shower from his garden hose.) (5) The injunction will not harm the public interest. In fact, the public interest will be better served by granting the preliminary injunction since the protestors' actions have, among other things, disrupted the flow of traffic through downtown Fort Wayne and required the presence of many policemen to control the crowds causing the police to be unable to respond promptly to other calls for assistance and causing the City of Fort Wayne what must be substantial costs to police these events. As the five prerequisites to the issuance of a preliminary injunction have been satisfied, the plaintiffs have met their burden of showing that the issuance of a preliminary injunction is appropriate.

Defendants' counsel emphasized to the court that the actions of his clients, whatever their degree of illegality, were "non-violent." This is substantially inaccurate. The actions of the demonstrators and rescuers clearly do violence to the rights of the plaintiffs in several respects as set forth above. More importantly, it is clear to the court that the potential for real violence is substantial in the situations described in the testimony and depicted in the video of the August rescue. The only reason that substantial violence has not occurred thus far (assuming one excludes the pushing and shoving that goes on in connection with the efforts to get patients into the clinic) is that the plaintiffs and their supporters have not responded to the acts of the defendants with their own illegal acts in support of their position. It is interesting to note that the hearing in this matter took place on the eve of the 20th anniversary of the Kent State shootings, which left four students dead. That event provides a graphic warning of the potential danger inherent in the kind of chaos depicted in the video of the August rescue.

As will be evident from the terms of the injunction set forth below, the court has endeavored to regulate only those activities which have been shown to involve these defendants and the response to the same by the supporters of the plaintiffs. Either side may apply for a modification of the injunction if they can present to the court competent evidence that the terms of the injunction should be modified because of further activities at a later date.

It is important to emphasize that the relief granted herein is not to be construed in any way as relieving the local law enforcement authorities of their responsibilities to enforce the state and local laws that may be violated in the course of further activities at the clinic. The court anticipates that those authorities will proceed as diligently as they have in the past to enforce the law. The court is concerned that, of all the misdemeanor cases resulting from the arrests made by the Fort Wayne Police, many of them more than one year ago, none of them have been brought to trial. It is important that these cases be resolved as expeditiously as possible so that everyone involved in these matters has a clear understanding of their rights and responsibilities.

 It is also important to emphasize that this court may punish, as contempt of court, failure to comply with this injunctive

order. *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *S.E.C. v. Simpson,* 885 F.2d 390 (7th Cir.1989). A court order must be obeyed unless, and until, it is reversed by orderly and proper proceedings. *United States v. Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Furthermore, violations of an underlying injunctive order are punishable as contempt even if the injunctive order is later set aside on appeal. *Pabst Brewing Co. v. Brewery Workers Local Union No. 77, AFL–CIO,* 555 F.2d 146 (7th Cir.1977). Pursuant to 18 U.S.C. § 401 [14] this court may impose a fine or imprisonment on anyone who, with knowledge of the injunctive order, willfully refuses to abide by its terms.

Let me conclude this discussion by expressing the hope that all parties to this matter and all interested in the important underlying public issues will abide by the terms of this order and the clearly established legal principles upon which it is based. As I indicated at the outset, this case, as it is presented to this court, is not about the ethical or moral implications of the abortion issue. It is about the orderly application and administration of the laws of this land as embodied in the United States Constitution, the relevant federal and state statutes, and the common law. It is this overriding responsibility which this court seeks to discharge by the terms of this order.

### Conclusion

Based on the foregoing, this court hereby GRANTS plaintiffs' motion for a preliminary injunction. Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that;

Defendants Wendell Brane, Bryan J. Brown, Ellen Brown, Northeast Indiana Rescue, their officers, agents, servants, employees and attorneys, and those persons in active concert and participation with them, are preliminarily enjoined pending disposition of this matter on the merits, from;

(1) trespassing on, blocking, or obstructing ingress into or egress from the Fort Wayne Women's Health Organization facility (the Clinic) located at 827 Webster Street, Fort Wayne, Indiana; and

(2) picketing or demonstrating any nearer to the Clinic than the curb line on the West side of Webster Street opposite the Clinic or within 25 feet of the Clinic on the East side of Webster Street; provided, however, that the activities permitted in paragraph 5 below are an exception to this limitation; and

(3) obstructing traffic on Webster Street; and

(4) shouting, screaming, chanting, yelling, or producing noise by any other means, in a volume that substantially interferes with the provision of medical services within the Clinic, including counseling; provided, however, that the provisions of this paragraph are not to be construed to prohibit the demonstrators from expressing their views to the public in the area of the Clinic; and

(5) approaching any person entering, leaving, working at, or using any services at the Clinic; provided, however, that sidewalk counseling, by one person only, consisting of reasonably quiet conversation of a non-threatening nature shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling and should anyone decline such counseling, that person shall have the absolute right to leave or walk away without harassment. It shall be a violation of this order to continue to attempt to counsel any person when such person has indicated his or her wish that such counseling cease. In addition, this right to sidewalk counseling as defined herein shall not limit the right

---

**14.** 18 U.S.C. § 401 states in relevant part:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

\* \* \* \* \* \*

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

of the Police Department to maintain public order by reasonably necessary rules and regulations as they decide are necessary.

(6) provided that nothing in this order shall be construed to limit the exercise of the legitimate First Amendment rights of the defendants or anyone acting in concert with them.

The Fort Wayne Women's Health Organization, Ulrich Klopfer M.D., and Jane Doe(s), their officers, agents, servants, employees and attorneys, and those persons in active concert and participation with them, are preliminarily enjoined pending disposition of this matter on the merits, from;

(1) in any way obstructing or interfering with the activities of defendants as set forth hereinabove by providing any "escorts" in the area of the Clinic as long as defendants are abiding by the terms of this order.

The defendant Northeast Indiana Rescue and its officers, the individual defendants, and those working in concert with them, are directed to inform all persons who assemble to participate in a rescue operation or similar event in concert with defendants of this preliminary injunction either by presenting all such persons with copies of this preliminary injunction or by reading the provisions of this preliminary injunction to the assembled persons prior to the commencement of any rescue or other group action.

The plaintiff Fort Wayne Women's Health Organization and its officers, and the individual plaintiffs, are directed to inform all persons working in concert with them of this preliminary injunction either by presenting all such persons with copies of this preliminary injunction or by reading the provisions of this preliminary injunction to all persons working in concert with them prior to the commencement of any rescue or other group action.

Prior to any demonstration, or as soon thereafter as practicable, the Fort Wayne Police Department shall read this injunction in its entirety to all persons present at said demonstration.

Any defendant or any other person subject to this order who fails to comply with this order shall be subject to a contempt penalty or imprisonment for each individual, separate violation of this order.

Plaintiffs shall not be required to post any security.